UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| REBECCA ALBERT CARNOT, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>JANET NAPOLITANO, )<br>Secretary, United States Department )<br>of Homeland Security, Customs and )<br>Border Protection, )<br>)<br>Defendant. ) | Civil Action No. 1:12-cv-00139-JAW |

## PLAINTIFF'S PRETRIAL MEMORANDUM

**I.   BRIEF FACTUAL STATEMENT OF PLAINTIFF'S CLAIMS AND DAMAGES.**

Rebecca Albert Carnot alleges that the Department of Homeland Security, Customs and Border Protection, ("CBP" or "the Employer") subjected her to a hostile work environment based upon her gender and religion, discriminated against her on the basis of sex, and retaliated against her in violation of Title VII by terminating her employment after she made a complaint of harassment to the EEOC.  Coburn Gore is a very small border crossing station typically employing 2-4 officers at any given time in close quarters with a total complement of approximately 10 employees.  Ms. Carnot began working for CBP in January 2009 and after attending training commenced work at Coburn Gore in June 2009.  Greg Pease was the Supervisory Customs and Border Protection Officer for the Coburn Gore port of entry and had served in that capacity for approximately 15 years.  Supervisor Pease is a fundamentalist Christian who states that he believes in the literal words of the Bible.

From the outset of Officer Carnot's employment at Coburn Gore, Supervisor Pease made numerous comments regarding his views on the role of women in society in large measure informed by his fundamentalist beliefs. In particular:

- Supervisor Pease stated that he did not believe that women should be involved in law enforcement;
- Supervisor Pease stated on multiple occasions that a woman's role is 15 feet from the oven;
- Supervisor Pease stated on multiple occasions that his wife should have his dinner hot and ready for him when he came home;
- During Ms. Carnot's first week of employment, while traveling in a car with no one else present, upon learning that Ms. Carnot was divorced, Supervisor Pease recommended that she "court" rather than "date." When Ms. Carnot questioned what the difference was, he explained that dating involved sexual intimacy and that Ms. Carnot should avoid engaging in sexual relations as had his daughters;
- On a second occasion, some six months later, when learning of Ms. Carnot's plans to go out on a date, Supervisor Pease disapproved of her decision and reiterated his advice about courting versus dating;
- Supervisor Pease boasted that his proudest moment was when his daughter got married and was still a virgin;
- Supervisor Pease referred to individuals who cohabit as "living in sin"
- Supervisor Pease referred to individuals who cohabit as "living in sin";
- Supervisor Pease inquired into the sexual habits of individuals crossing the border.

Not only did Supervisor Pease bring his fundamentalist views of a woman's place in society into the workplace and try to impress them upon Ms. Carnot, but he also attempted to recruit her to join his church, criticized her Catholic upbringing, and proclaimed his own fundamentalist views:

- Supervisor Pease invited Ms. Carnot to attend his church so she could meet a nice religious man;
- Supervisor Pease told Ms. Albert that she would not go to heaven because she was divorced;
- Supervisor Pease claimed all Catholic priests were gay and going to go to hell
- Supervisor Pease compared a mass to a gym workout;
- Supervisor Pease regularly referred derogatorily to homosexuals as "Section 212a queers," implying that they were ineligible to enter the country.

In August 2010, Ms. Carnot complained to the EEOC that she believed that Supervisor Pease had subjected her to a hostile work environment. Upon learning of the complaint, Supervisor Pease and the entire Border Protection command commenced a campaign of retaliation against Ms. Carnot, ultimately culminating in her termination.

- On September 13, 2010, the very day that Supervisor Pease admits he learned of the complaint to the EEOC, he disciplined Ms. Carnot for disclosing to a sister agency several months earlier that Saudi nationals had been detained at the border with bulletproof vests and mace;[1]

---

[1] Supervisor Pease claims that he disciplined Ms. Carnot not for the disclosure but for lying about it to him. Officer Carnot denied doing so. In any event, Officer Peter Farnsworth, a far more senior officer, admittedly lied to Supervisor Pease about the event and was not disciplined at all.

- The same day, Supervisor Pease accused Ms. Carnot of lying about having changed the combination to a safe used to store contraband a number of months earlier. Supervisor Pease refused Ms. Carnot's repeated offers to show that she could do so;
- In November 2010, Supervisor Pease rewarded three male co-workers with gift cards for their role in the seizure of marijuana; Ms. Carnot, who initiated the apprehension, received nothing;
- In January 2010, Supervisor Pease recommended and CBP agreed to terminate Ms. Carnot several months after she filed the charge of discrimination.

Rebecca Carnot is not the only woman who has felt subjected to a hostile work environment while working at Coburn Gore under the thumb of Supervisor Pease. Daphne Harp-Ellis worked there as an officer before Ms. Carnot and voluntarily transferred to Border Patrol, a sister agency, because of Supervisor Pease's insistence on bringing his views on sex and religion into the workplace.

[redacted]

II.     **CONTROVERTED POINTS OF LAW.**

   A. **Whether CBP Subjected Rebecca Carnot To A Hostile Work Environment Based Upon Her Sex And Religion.**

A jury readily could conclude that CBP subjected Officer Carnot to a hostile work environment based upon her sex and religion.  To prevail on a hostile work environment sexual harassment claim, a plaintiff must establish: (1) membership in a protected class and (2) unwelcome sexual harassment, (3) which was based on sex, (4) was sufficiently severe or pervasive, (5) was objectively and subjectively offensive, and finally (6) that some basis for employer liability has been established.  *Forrest v. Brinker Int'l Payroll Co.,* 511 F.3d 225, 228 (1st Circ. 2007).  Here, Ms. Carnot is a member of a protected class, the harassment was unwelcome (as evidenced by her charge filed with the EEOC) and was based on sex (the comments were stereotypical comments about women and their role in society), and they were both objectively and subjectively offensive (women should remain at home, stand by the oven, have dinner ready, refrain from sexual intimacy until married).  The only real issues here are whether they were severe or pervasive[4] and whether there is a basis for employer liability.

In evaluating whether an environment is hostile, courts look to "all the circumstances," including "the frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc*. 510 U.S. 17, 23 (1993).

"Evidence of sexual remarks, innuendoes, ridicule, and intimidation may be sufficient to support a jury verdict for a hostile work environment." *O'Rourke v. City of Providence,* 235 F.3d 713, 729 (1st Cir. 2001); accord *Vera v. McHugh,* 622 F.3d 17, 27 (1st Cir. 2010).

Here, considering all the relevant circumstances, it is clear that CBP subjected Ms. Carnot to a hostile work environment. Carnot worked in a small border patrol station with only several employees at any given time, and some of the most egregious harassment—the statement about courting versus dating—occurred on a car ride. The harassing comments occurred frequently over an extended period of more than sixteen months and were made by Ms. Carnot's direct supervisor, who enjoyed a position of authority over her and had the power to discipline or terminate her at will. See Lindemann & Kadue, Workplace Harassment Law, p. 19-23 (noting that harassment may be considered "more serious when the harasser was a supervisor who could affect the terms and conditions of the plaintiff's employment" (citing cases)). Pease's ongoing pattern of humiliating, offensive comments, directed at Carnot on a regular basis over a period of more than a year, constitutes a hostile work environment.

Where, as here, a supervisor's harassment culminates in a tangible employment action, the employer is vicariously liable and no affirmative defense is available. *Faragher v. City of Boca Raton*, 524 U.S. 775, 807-08 (1998). Pease's decision to terminate Ms. Carnot clearly constitutes a tangible employment action.[5] Hence, a jury could find CBP liable for subjecting Ms. Carnot to a hostile work environment based on her sex.

---

[4] Conduct can be either severe or pervasive; it need not be both. *Gomez-Perez v. Potter,* 2011 WL 6445569, at *5 (1st Cir. Dec. 22, 2011); *O'Rourke v. City of Providence,* 235 F.3d 713, 728 (1st Cir. 2001).

[5] Arguably, the decision to issue Ms. Carnot a warning for allegedly lying that she had shared information with Border Patrol, and the denial of a gift card to her when others received a gift card for apprehending an individual attempting to smuggle marijuana into the country, also constitute tangible employment actions. *Lugo v. Avon Products, Inc.,* 777 F.Supp. 2d 275, 293 (D.P.R. 2011).

For much the same reasons, a jury could conclude that CBP subjected Ms. Carnot to a hostile work environment based upon her religion. A religious harassment case involves the same elements as a sex harassment case except the conduct must be based on religion rather than sex. See *O'Connor v. Northshore Intern. Ins. Services Inc.,* 21 Fed. Appx. 15, 17 (1st Cir. 2001); *Olivieri v. Abbott Laboratories,* 2008 WL 747082, * 6 (D.P.R. March 19, 2008). Here, not only did Supervisor Pease make a number of disparaging remarks about Plaintiff's religion, but his frequent religious-based comments about homosexuals and the role of women also contributed to the hostile work environment.

### B.  Whether CBP Discriminated Against Rebecca Carnot On the Basis Of Sex In Violation of Title VII.

Ms. Carnot also contends that, distinct from her hostile work environment claim, she was discriminated against because of her sex. The "simple question posed by sex discrimination suits is whether the employer took an adverse employment action *at least in part* because of an employee's sex." *Chadwick v. WellPoint, Inc.,* 561 F.3d 38, 44 (2009). Here, a jury could reasonably conclude that Supervisor Pease's decision to discipline Ms. Carnot for allegedly lying to him about the Saudi incident when he failed to similarly discipline Peter Farnsworth, who undisputedly lied; his decision not to award her a gift certificate when all male agents involved in the apprehension of marijuana received certificates; and his decision to terminate Ms. Carnot all constitute sex discrimination.

### C.  Whether CBP Retaliated Against Rebecca Carnot In Violation Of Title VII When It Disciplined And Then Terminated Her.

Finally, a jury readily could conclude that CBP terminated Carnot in retaliation for her EEO complaint, based on both the close temporal proximity of the relevant events and the pretextual nature of CBP's stated reasons for her discharge.

" 'To establish a claim of retaliation, a plaintiff must show that (1) she engaged in protected conduct, (2) she suffered an adverse employment action, and (3) there was a causal connection between the protected conduct and the adverse employment action.'" *Willinghan v. Town of Stonington,* 847 F.Supp.2d 164, 189 (D. Me. 2012), quoting *Valle-Arce v. Puerto Rico Ports Auth.*, 651 F.3d, 190,198 (1st Cir. 2011). Only causation is in question here.

"When an adverse employment action follows hard on the heels of protected activity, the timing often is strongly suggestive of retaliation." *Collazo v. Bristol-Myers Squibb Mfg., Inc.,* 617 F.3d 39, 50 (1st Cir. 2010) (internal quotation marks and citation omitted). See generally *Harding v. Cianbro Corp.*, 498 F.Supp. 2d 344, 350 (D. Me. 2007). Here, the temporal proximity of Ms. Carnot's discharge to her complaints about Mr. Pease strongly suggests a causal connection. On September 13, 2009, the very day that Pease admits he learned of the EEOC complaint, Supervisor Pease issued Ms. Carnot a warning for events that had taken place two and three months earlier. Thereafter, he scrutinized her performance and ultimately initiated termination within three months of learning of the complaint and two months after the complaint was investigated.

In addition to the suspicious timing of events, the implausibility of CBP's proffered reasons for terminating Ms. Carnot further demonstrates that the termination was causally connected to her protected conduct. "An employee can establish pretext 'by showing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons such that a factfinder could infer that the employer did not act for the asserted non-discriminatory reasons." *Carreras v. Sajo, Garcia & Partners*, 596 F.3d 25, 37 (1st Cir. 2010). Incidences of disparate treatment in the workplace based upon a protected characteristic, or discriminatory comments made by decisionmakers or those who influence

decisionmakers, also may be used to show pretext. *Kosereis v. Rhode Island,* 331 F.3d 207, 213 (1st Cir. 2003); *Santiago-Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 55 (1st Cir. 2000).

Here, a jury easily could conclude that CBP's stated reasons for terminating Carnot are pretextual. As stated in CBP's January 3, 2011 termination letter to Carnot, CBP claims it terminated Carnot based on four alleged incidents which, according to CBP, amounted to "false, misleading, incomplete or ambiguous statements." The four incidents cited by CBP, none of which it disciplined Carnot for until <u>after</u> she filed her EEO complaint, are (1) Carnot's claim that she changed the combination for the Port of Entry safe in March 2010; (2) Carnot's filing of a CA-1 form for leaving work to go to the hospital in June 2010; (3) Carnot's submission of an inaccurate overtime ticket on September 14, 2010, and (4) Carnot's submission of a claim for 15 minutes of overtime on October 31, 2010. Plaintiffs will demonstrate that CBP's proffered reason for Carnot's termination is implausible and unworthy of credence.

First, the evidence will demonstrate that CBP had no basis for concluding that Carnot made false or misleading statements with respect to changing the safe combination. Pease instructed Carnot to change the Port of Entry safe combination in or about March 2010, and after reading the safe manual, she successfully changed the combination. She successfully opened the safe with the new combination multiple times, and demonstrated that she could do so in front of Pease. In July 2010, Carnot and Officer McKendry, who was acting as a temporary supervisor at Coburn Gore at the time, unsuccessfully attempted to open the safe using Carnot's combination. McKendry informed Farnsworth, who immediately tried to open the safe without first asking for Carnot's combination; Farnsworth was also unsuccessful. McKendry then gave Carnot's combination to Farnsworth, at which point Farnsworth became flustered and frustrated and said

9

he had to go home and would try to open the safe later.  A day or two later, Farnsworth reported that he had successfully opened the safe using his old combination, although McKendry did not observe him doing so.  McKendry thought there was something odd about Farnsworth's behavior related to the safe, which she reported to Officer Pease.  McKendry saw no basis for concluding that Carnot had lied or misled anyone about changing the safe combination, and Carnot did not receive any kind of disciplinary warning at the time.  Instead, on September 13, 2010, the same day Pease admits to learning about Carnot's EEO complaint, Pease held a meeting with Carnot in which he accused her of lying about changing the safe combination.  Although Carnot offered several times during the meeting to show Pease that she was able to change the safe combination, he refused to allow her to do so.

 Second, the evidence will demonstrate that CBP had no grounds for concluding that Carnot made false or misleading statements with regard to the CA-1 workers' compensation form.  CBP did not give officers any training on when or how to prepare a CA-1 form, but officers are instructed that if they are uncertain about whether an injury is work-related, they should fill out a CA-1 form, and Officer Pease repeatedly said to officers, "When in doubt, fill one out."  On June 22, 2010, Carnot experienced a sharp pain in her lower back while lifting a bed frame at work.  She informed Supervising Officer Gibbs, left work and sought emergency medical treatment for the pain, which turned out to be a kidney stone.  Carnot's doctor told her that her activities at work hastened the passing of the kidney stone. She later received a bill from the hospital stating the claim may be work-related and asking for information regarding her workers' compensation carrier.  While in the hospital, Carnot spoke to Gibbs and explained that the doctors thought it was a kidney stone; Gibbs told her that he would fill out an electronic CA-1 form for her.  On July 13, 2010, Ruddy, a more senior officer, instructed Carnot that she

should fill out a paper CA-1 form for her file, which she did.  Carnot later withdrew her CA-1 form in September 2010, when directed to do so by Asst. Port Director Cuddy.

  Third, the evidence will refute CBP's assertion that Carnot made false or misleading statements with regard to her submission of an inaccurate overtime claim on September 14, 2010.  On September 14, Carnot carpooled with a fellow officer, Wappett, to attend a day-long training in Jackman, Maine.  When Wappett and Carnot returned to Coburn Gore at the end of the day, Carnot entered her overtime on the Port of Entry's electronic system, but mistakenly entered that she had worked until "1730," (1.5 hours of overtime), when in fact she and Wappett had worked until "1630 " (.5 hours of overtime).   The hard-copy master schedule at Coburn Gore, which was regularly reviewed by supervisors and compared to the electronic pay records, shows that Carnot entered the correct time of "1630" for her September 14 shift.  The following day, McKendry, who approved overtime requests as part of her duties as temporary supervisor, reviewed the electronic time entries and became aware of the discrepancy between Carnot's entry of "1730" and Wappett's entry of "1630."  McKendry emailed Carnot, stating that she had changed Carnot's entry to 1630 and approved it, to which Carnot replied "Perfect" and explained that she had tried to change the entry but the electronic system had not allowed her to do so.  McKendry did not think Carnot's time entry mistake was a big deal, as these types of time card errors were not uncommon, particularly when military time was involved.  For example, Officer Hayes admitted to making numerous mistakes in reporting his time, but Pease simply corrected his mistakes; he was never disciplined for his errors, let alone terminated.  Carnot was not spoken to about this incident at the time, but instead first learned it was an issue when she received her termination letter.

Fourth, the evidence will demonstrate that there is no basis for CBP's assertion that Carnot made false or misleading statements with respect to the October 28, 2010 overtime incident.  On October 28, Carnot was working an 8am to 4pm shift with fellow officer Carbone.  According to the wall clock, Carnot left her shift at 4:08 p.m.  On October 31, Carnot submitted an electronic claim for fifteen minutes of overtime, based on instruction from Supervisor Gibbs that officers earn 15 minutes of overtime when they work any part of the fifteen-minute increment.  CBP later asserted that she had falsely claimed overtime, based on its review of video showing that, according to the time readout on the video feed, Carnot left her shift at 4:02 p.m.  CBP made no attempt to determine whether the office clock was synchronized with the video feed clock; and the evidence will demonstrate that employees typically rely on the wall clock, not the time readout on the video feed, when reporting their time.  Carnot was not spoken to about this incident at the time, but instead first learned it was an issue when she received her termination letter.

Based on this evidence, a jury will likely conclude that CBP's proffered rationale that it terminated Carnot for making "false or misleading statements" in the course of the above incidents is weak, flimsy and implausible.

### III.     PROPOSED STIPULATIONS.

A. Copies instead of originals for all exhibits.

B. All medical records produced to date are admissible without further authentication.

### IV. PLAINTIFF'S WITNESSES.

Rebecca Albert Carnot
c/o Jeffrey Neil Young
P.O. Box 5000
Topsham, ME 04086
207-725-5581

Juan Carnot
c/o Jeffrey Neil Young
P.O. Box 5000
Topsham, ME 04086
207-725-5581

June Albert
c/o Jeffrey Neil Young
P.O. Box 5000
Topsham, ME 04086
207-725-5581

Daphne Harp-Ellis
11 Quarry Lane
Stratton, ME 04982
207-491-6944

Leslie McKendry
618 Long Pond Road
Jackman, ME 04945
207-668-7808

Danny Gahagan
49 High Street
Limestone, ME 04750
207-316-4965

Alan Mulherin
379 Van Buren Road
Limestone, ME 04750
207-540-3500

Plaintiff reserves the right to call anyone on Defendant's witness list.

### V. PLAINTIFF'S EXHIBITS

A. All documents produced by Plaintiff.

  B. All documents produced by Defendant.

              Respectfully submitted,

Dated: May 10, 2013      /s/ Jeffrey Neil Young
              Jeffrey Neil Young
              Carol J. Garvan
              McTEAGUE HIGBEE
              Four Union Park
              P.O. Box 5000
              Topsham, ME 04086
              (207) 725-5581
              jyoung@mcteaguehigbee.com
              cgarvan@mcteaguehigbee.com

              *Counsel to Plaintiff*

## CERTIFICATE OF SERVICE

  I, Jeffrey Neil Young, hereby certify that on May 10, 2013, I electronically filed Plaintiff's Pretrial Memorandum with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to the following: Evan Roth, Assistant US Attorney at Evan.Roth@usdoj.gov.

              /s/ Jeffrey Neil Young
              Jeffrey Neil Young
              McTEAGUE HIGBEE
              Four Union Park
              P.O. Box 5000
              Topsham, ME 04086
              T: (207) 725-5581
              F: (207) 725-1090
              jyoung@mcteaguehigbee.com